IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

STEPHANIE D.,

     Plaintiff,

v.                                                                  CIVIL ACTION NO. 2:24-cv-00643

FRANK BISIGNANO,[1]
Commissioner of Social Security,

     Defendant.

## PROPOSED FINDINGS & RECOMMENDATION

Plaintiff Stephanie D. ("Claimant") seeks review of the final decision of Defendant, the Commissioner of Social Security (the "Commissioner"), denying her application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33. This matter was referred by standing order to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 4). Presently pending before this Court are Claimant's *Brief in Support of Complaint* (ECF No. 6) and the Commissioner's *Brief in Support of Defendant's Decision* (ECF No. 9). Having fully considered the record and the parties'

---

[1] Frank Bisignano became the Commissioner of Social Security on May 7, 2025, at which time he was automatically substituted as a party pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. *See also* 42 U.S.C. § 405(g) (providing that an action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

arguments, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 6), **GRANT** the Commissioner's request to affirm his decision (ECF No. 9), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.    BACKGROUND

### A.    Information about Claimant and Procedural History of Claim

Claimant was forty-seven years old at the time of her alleged disability onset date and forty-nine years old on the date of the decision by Administrative Law Judge Valerie Bawolek (the "ALJ"). (Tr. 15, 267).[2] She has a high school education, and past relevant work experience including a position as an insurance sales agent. (Tr. 285-286). Claimant alleges that she became disabled on September 18, 2021, due to the following physical impairments: chronic back and neck pain/lumbago; lumbar and cervical facet joint arthropathy; chronic thoracic trigger point pain; nerve pain/radiculitis; disc collapse and protrusions; degenerative disc disease/arthritis; seizure disorder; thyroid condition/no thyroid; frequent headaches; and chronic right shoulder pain. (Tr. 284).

Claimant filed her application for Title II benefits (the "claim") on September 21, 2021. (Tr. 15). The Social Security Administration (the "Agency") denied the claim initially on January 26, 2022, and again upon reconsideration on August 12, 2022. (Tr. 15, 120-128). Thereafter, on or about September 6, 2022, Claimant filed a written request for hearing. (Tr. 15). An administrative hearing was held before an ALJ on August 8, 2023. (Tr. 15). Later a supplemental administrative hearing was held before an ALJ on April 8, 2024. (Tr. 15). Subsequently on April 22, 2024, the ALJ entered an unfavorable decision.

---

[2] All references to "Tr." herein refer to the administrative *Transcript of Proceedings* filed in this action at ECF No. 5.

(Tr. 15-31). Claimant then sought review of the ALJ's decision by the Appeals Council on or about June 6, 2024. (Tr. 8-11). Ultimately the Appeals Council denied Claimant's request for review on September 11, 2024, and the ALJ's decision became the final decision of the Commissioner on that date. (Tr. 1-4).

Claimant brought the present action on November 12, 2024, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner filed a transcript of the administrative proceedings on January 8, 2025. (ECF No. 5). Claimant subsequently filed her *Brief in Support of Complaint* on February 6, 2025. (ECF No. 6). In response, the Commissioner filed his *Brief in Support of Defendant's Decision* on April 9, 2025. (ECF No. 9). Claimant then filed her *Reply Brief* on April 22, 2025. (ECF No. 10). Accordingly, this matter is now ripe for adjudication.

### B.    Relevant Evidence

The undersigned has considered all evidence of record pertaining to the parties' arguments—including the relevant medical evidence regarding Claimant's shoulder impairment and mental-health impairments—and summarizes the relevant portions here for the convenience of the United States District Judge.

### i.    Treatment Records—Relevant Physical Impairments

Orthopedic surgeon S. Brett Whitfield, M.D., examined the Claimant on July 6, 2017, and diagnosed mild impingement syndrome of the left shoulder, neck pain with possible referred left shoulder pain, mild left carpal tunnel syndrome, tight quadriceps with patellofemoral syndrome, and moderate right patellofemoral arthritic changes. (Tr. 784-788).

X-rays of the Claimant's cervical spine dated February 26, 2018, revealed mild degenerative changes. (Tr. 775). Additionally, orthopedic spine surgeon Rajesh V.

Patel, M.D., examined the Claimant on February 26, 2018, and diagnosed cervical disc protrusion, cervical annular tear, and left cervical radiculitis. (Tr. 770-774). A few months later, she was diagnosed with acute lateral epicondylitis of the right elbow. (Tr. 765-768, 861-865).

The Claimant presented to Vaught Neurological Services on June 13, 2019, and reported episodes of right facial numbness and confusion, beginning one year prior; she reported a more recent episode that involved staring off and being unresponsive when addressed and described being very fatigued following the episode. (Tr. 395-399). Barry K. Vaught, M.D., examined the Claimant and diagnosed unspecified convulsions and prescribed medication. *Id.* The Claimant was unable to tolerate the initial medication, but she was subsequently started on Topamax and she reported some associated cognitive slowing and mood issues. (Tr. 523-546). Electroencephalogram findings in August 2019 were normal. *Id.*

The Claimant sought treatment at MedExpress on July 28, 2019, with symptoms of right shoulder pain that had been ongoing for months. (Tr. 432-435). On examination, the Claimant had full strength against resistance in her shoulder and there was no swelling or deformity noted; she had full, but painful, range of motion in her right shoulder; there was tenderness in her right glenohumeral joint. *Id.* X-rays of her right shoulder indicated no acute bone abnormality or significant degenerative disease. *See id.*

On August 7, 2019, the Claimant was referred to physical therapy for treatment of right shoulder pain and instability associated with glenohumeral dysfunction and cervical dysfunction. (Tr. 401-402). The Claimant returned to MedExpress on August 10, 2019, with symptoms of right shoulder pain that radiated across her back to her

left shoulder. (Tr. 436-439). On examination, she had limited range of motion and tenderness in her neck as well as limited range of motion in her right shoulder and pain on palpation of the biceps tendon. *Id.*

On August 16, 2019, an MRI of the Claimant's right shoulder revealed moderate nonspecific marrow edema within the distal/lateral aspect of the clavicle acromioclavicular (AC) joint. (Tr. 926-928). There was tendinosis on the intra-articular portion of the biceps tendon as well as extension of the intermediate signal into the biceps labral anchor; there was no evidence of a rotator cuff tear; there was mild lateral downsloping of the lateral aspect of the acromion with a curved undersurface with a small anterior hook. *Id.*

At Claimant's third physical therapy visit on August 26, 2019, she reported improvement in her right shoulder symptoms. (Tr. 407-408). An MRI of the Claimant's cervical spine dated August 30, 2019, indicated mild cervical spondylosis and left paracentral and lateral disc bulging C5-6 and to a lesser extent C4-5 causing minimal left anterior canal and foraminal encroachment. (Tr. 924).

In October 2019, Claimant returned to physical therapy and continued to report right shoulder pain symptoms that were aggravated with activity. (Tr. 409-410). On examination, she had limited range of motion in her cervical spine as well as weakness, instability and crepitus in her right upper extremity. *Id.*

Dr. Patel examined the Claimant in October 2019 and diagnosed right shoulder osteolysis, right shoulder acromioclavicular joint arthritis, cervical degenerative disc disease, and mild left sided foraminal narrowing. (Tr. 755-761). Her neck and shoulder pain symptoms were treated with injections, but she reported no more than four months of symptom relief following the injections. *See id.*

The Claimant returned to physical therapy on March 3, 2021, with symptoms of neck pain and low back pain associated with diagnosed cervical disc disease with radiculopathy and lumbago with sciatica. (Tr. 418-424). After the first therapy visit, the Claimant reported an episode of intense headache with associated tingling into her left hand. *Id.*

The Claimant returned for a fourth physical therapy visit on March 15, 2021, but then she failed to return and she was eventually discharged from physical therapy in July 2021. (Tr. 428-431). Claimant returned to her primary care provider on September 13, 2021, and reported no significant improvement in neck and back symptoms with either physical therapy or epidural and trigger point injections. (Tr. 574-581).

On September 15, 2021, Michael A. Istfan, M.D., examined the Claimant regarding symptoms of neck pain, low back pain, fatigue, poor sleep, swelling in her legs, diarrhea, abdominal pain, easy bruising, joint pain/stiffness, weakness, numbness/tingling, history of seizures, memory problems, and difficulty concentrating; she denied headaches, fever, rash, shortness of breath, and itching. (Tr. 501-514). She described shoulder discomfort, more prominent on the right, and she attributed this pain to repetitive use of her upper extremities at work. (Tr. 505). On examination, the Claimant had full range of motion in her neck; motor strength was normal in her upper and lower extremities; range of motion was mildly limited in the Claimant's cervical spine; she had some tenderness and mild pain with abduction of her shoulders, but range of motion was normal; there was mild tenderness in her hips and knees as well as mild patellofemoral crepitus in her knees, but range of motion was normal; diffuse muscle tenderness was noted with multiple trigger points. (Tr. 505-506). Dr. Istfan noted Claimant's symptoms were consistent with

fibromyalgia, degenerative joint disease of the spine, and localized inflammation; he assessed multiple joint pain, low back pain and multiple sites, myalgia, and numbness. (Tr. 506-514).

On September 21, 2021, orthopedic surgeon S. Brett Whitfield, M.D., examined the Claimant and found tenderness at her right shoulder, distal clavicle, acromioclavicular joint, and cervical spine. (Tr. 726-728). Following treatment with injection, the Claimant reported continued right shoulder pain. *See id.*

When she followed up at West Virginia Pain Institute on October 11, 2021, the Claimant reported some worsening numbness in her arm following treatment with injection. (Tr. 942). Claimant was assessed with cervical disc disorder with radiculopathy and instructed to follow up with Dr. Patel for the numbness and pain in her arm. (Tr. 943).

The Claimant returned to her primary care provider at Beaver Family Clinic on October 25, 2021, and reported ongoing pain in her neck and back that worsened with standing/sitting for extended periods and with car travel, despite injections and medication; she also reported fatigue, but denied any recent seizure-like episodes. (Tr. 582-588). On examination, the Claimant had tenderness in her cervical spine, shoulders, and lumbar spine. *Id.* Medications were increased and adjusted and she was advised to remain off work four more weeks. *Id.*

In March 2022, Dr. Patel administered injections in the Claimant's cervical spine for treatment of diagnosed cervical spondylosis, cervical facet arthropathy, and cervicalgia. (Tr. 708-712). Although the Claimant reported excellent relief of right shoulder pain symptoms initially following a right acromioclavicular joint injection,

(*see* Tr. 704), she was eventually referred to the pain clinic to try some different pain management options and seek more long-term relief. (Tr. 703).

On April 18, 2022, x-rays of the Claimant's right shoulder indicated no acute finding. (Tr. 853). X-rays of her right shoulder indicated some arthritic changes in the distal clavicle, but no fracture or dislocation was indicated; medium joint arthrocentesis procedures were performed for treatment of arthritis. (Tr. 704-707).

On May 13, 2022, x-rays of Claimant's right shoulder indicated some arthritic changes in the distal clavicle, but no fracture or dislocation was indicated; medium joint arthrocentesis procedures were performed for treatment of arthritis. (Tr. 661-662).

The Claimant followed up with her primary care provider in September 2023, and she reported chronic numbness in her left arm, related to neck issues; she denied any increased muscle weakness. (Tr. 1057). On examination, she had normal muscle tone and motor strength as well as normal movement in all extremities. *Id.*

The Claimant presented to Ortho Virginia in January 2024 and reported increased right shoulder pain symptoms associated with mopping and also reported that she felt a pop in her right bicipital region after pushing her dog off her bed. (Tr. 1098-1104). X-rays of the Claimant's right shoulder on January 11, 2024, revealed type II acromion, an indicator of impingement; there was no soft tissue swelling or effusion as well as no acute fractures or dislocations. (Tr. 1102). An injection was administered for treatment of right rotator cuff syndrome and right shoulder impingement. (Tr. 1104).

### ii.    Treatment Records—Mental Impairments

Claimant was seen by her primary-care provider via telehealth at Beaver Clinic on October 20, 2020. (Tr. 553-558). Claimant reported that she was "doing well" and tolerating her medications well. (Tr. 555). With respect to Claimant's diagnosis of chronic

depressive disorder, treatment notes indicate that Claimant's "mood [was] stable on prozac." (Tr. 555). Further, treatment notes indicate a negative depression screen—answering "not at all" in response to whether she had been "feeling down, depressed, or hopeless" over the last two weeks. (Tr. 554). On examination, she was found to have a congruent mood and normal affect (Tr. 556). The treatment plan was to continue Claimant's prescription for Prozac. (Tr. 558).

Claimant followed up with Beaver Clinic in Beaver, West Virginia, on November 22, 2021, where it was noted that with respect to her complaints of depression/anxiety, she was "stable on meds overall." (Tr. 592). A mental-status examination was grossly normal. (Tr. 593). Claimant was seen in the emergency department of Raleigh General Hospital, in Beckley, West Virginia, on November 24, 2021 with a primary complaint of back pain. (Tr. 869). On examination, she was found to be "[a]wake, alert, with orientation to person, place, and time," and her "[b]ehavior, mood, and affect [w]ere within normal limits." (Tr. 873).

Claimant followed up with Beaver clinic on December 6, 2021. (Tr. 595). Claimant reported feeling tired/having little energy as well as frequent trouble concentrating, making daily function "somewhat difficult." (Tr. 596). Claimant reported that, due to being off work due to physical conditions, she "feels depressed with lack of interest." (Tr. 598). However, she denied anxiety or depression. (Tr. 599). Her provider's treatment plan was to increase Claimant's medication and monitor the response. (Tr. 600).

Claimant was seen by Caleb Workman, D.O., on November 9, 2022. She reported "possible depression, very unusually emotional, [and] constant headaches" and wished "to discuss med changes." (Tr. 987). Treatment notes further indicate that Claimant reported "worsening depressive type symptoms" including crying easily, decreased

motivation, anhedonia, decreased sleep, increased forgetfulness, and weight loss. (Tr. 991). A mental-status examination resulted in a finding of "normal mood and affect." *Id.* She was prescribed a new medication "in hopes of better control of depression" and instructed to follow up. (Tr. 992).

Claimant returned to Dr. Workman for her "yearly preventative visit" on January 16, 2023. (Tr. 980-984). Claimant had a normal mental-status examination, with good insight and judgment as well as a normal mood and affect. (Tr. 984). The treatment notes do not indicate any discussion with respect to her mental-health symptoms. *See id.* Claimant was continued on her medications. (Tr. 985).

In April 2023, Claimant was seen by psychologist Misti Jones-Wheeler, M.S., on referral from Dr. Workman. (Tr. 976). Claimant reported difficulty adjusting to work discontinuation; she reported that she was home all the time with her husband who worked from home as well as two adult children who did not work, and she had no time alone. (Tr. 976-977). She was diagnosed with adjustment disorder with depression and instructed to follow up in two weeks. *See id.* The Claimant followed up about two weeks later on May 9, 2023. (Tr. 978). Claimant reported that "[t]hings have been somewhat better," although she reported feeling "bored and stuck at home often." *Id.* Ms. Wheeler recommended "work on finding some hobbies, etc.," and to follow up in two weeks. *Id.* Subsequently, Claimant cancelled her follow-up appointments with Ms. Wheeler; there is no other evidence of mental health treatment in the record.

### iii.    Hearing Testimony

At the initial August 8, 2023 hearing before the ALJ, Claimant was represented by counsel. (Tr. 62). During the hearing, the ALJ heard testimony from two impartial medical experts: (1) Kweli Amusa, M.D., and (2) Richard Cohen, M.D.

10

First, Dr. Amusa testified. Dr. Amusa is board-certified in internal medicine. (Tr. 65). She testified that the evidence—including medical imaging—shows that Claimant suffers from chronic pain—"primarily spinal pain"—as well as degenerative disease. *Id*. Dr. Amusa detailed the medical records documenting Claimant's treatment for these physical issues, which she linked primarily to arthritis. (Tr. 66). She testified that Claimant received nerve-block treatment, but it did not provide long-lasting relief. *Id*. Claimant also has pain in her knees due to arthritis. Further, there was also unspecified evidence of issues with Claimant's right shoulder. *Id*.

With respect to Claimant's complaint of fibromyalgia, Dr. Amusa further testified that Claimant saw a rheumatologist in 2021 "regarding the joint pain and back pain." (Tr. 66-67). According to Dr. Amusa, "[t]he rheumatologist is not noting specifically fibromyalgia, just noting that [Claimant] has diffused tender points." *Id*. Dr. Amusa added that she "d[id]n't see there is treatment for that condition." (Tr. 67). Rather, Dr. Amusa attributed Claimant's pain "to degenerative disc disease in her spine, in thoracic, and lumbar, and her arthritis in her joints." *Id*. Dr. Amusa further testified, as relevant, that Claimant should be limited to "just occasional" bilateral overhead reaching, "mostly addressing the cervical spine and [Claimant's] right shoulder." (Tr. 67-68).

Second, Dr. Richard Cohen, M.D.—a board-certified psychiatrist—testified that Claimant's adjustment disorder with some depression and anxiety improved with medication. (Tr. 70-71). Dr. Cohen further testified that the record was "very thin," particularly with respect to Claimant's depression in light of conflicting records indicating that she had a normal mood. (Tr. 71). Further, Dr. Cohen testified as follows with respect to Claimant's "B criteria" regarding the four areas of mental functioning:

Utilizing and applying information. She has a 12th-grade education. Memory is within normal limits. This is mildly impaired. Social functioning, she has a long-term interpersonal relationship with her husband, which is harder than superficial relationship at work. She gets along with others. She's not psychotic. This is all mild impairment. Concentration, persistence, and pace . . . she does also attend social activities. She is able to drive her car which requires a great deal of concentration . . . . [A]ny limitations of activities and daily living are due to her physical problems and not emotional problems . . . . She is able to make meals . . . does the dishes . . . cleans . . . shops . . . [and] handles money. Although she does have problems handling stress. So, I won't call this not impaired. I will call it mildly impaired. All functional limitations emotionally are due to - - are all mild. I don't have any work-related limitations for her emotionally. The records are very thin. There's no . . . materiality.

(Tr. 71-72). Additionally, in response to questioning from Claimant's counsel, Dr. Cohen testified that there would be mild impact upon Claimant's ability to concentrate or remember due to physical pain. (Tr. 72-73).

The hearing was then adjourned after the testimony of the medical experts because the ALJ believed a consultative physical examination was warranted. (ECF No. 6 at 1; Tr 73).

Subsequently, a supplemental administrative hearing was held before the ALJ on April 8, 2024. (Tr. 15). Claimant was represented by counsel and testified under oath. (Tr. 38). Claimant testified that she experiences problems related to the cervical spine and neck area, causing numbness and tingling as well as pain that extends into her left arm and hands. (Tr. 44). These problems limit her mobility including her ability to turn her head. *Id.* Similarly, Claimant testified that she experiences problems with her right shoulder, including problems with her joints necessitating regular injections for pain. (Tr. 47). Claimant testified that she has "a rotator cuff issue and an impingement issue . . . that has brought a whole new world of pain through [her] arm." *Id.* As a result, she is "limited with that arm" in that she experiences pain and difficulty reaching across her body or

behind her back. *Id.* She further testified that she is treating these problems with physical therapy and hopes to avoid surgery. *Id.* at 47-48. Claimant also expressed problems with migraine headaches, typically occurring at a frequency of once per week. (Tr. 46). Furthermore, Claimant testified that fibromyalgia causes frequent pain in her hands and occasional numbness and pain in her feet, as well as "a lot of fatigue." (Tr. 48). With respect to her mental-health problems, Claimant testified that she experienced depression and anxiety when she transitioned from working full time to "being home all the time." (Tr. 49). She testified that she rarely leaves the house. *Id.* Additionally, Claimant testified that she experiences difficulty with memory and concentration due to pain, including constant distraction, losing her train of thought, and having difficulty finding words when speaking. *Id.*

David A. Zak, an impartial vocational expert ("VE"), also testified during the supplemental administrative hearing on April 8, 2024, in order to aid the ALJ in determining whether Claimant could perform her past relevant work, or other work. (Tr. 50). Classifying Claimant's past relevant work, the VE testified that Claimant worked as an insurance sales agent, department manager for a tanning salon, and retail chain store area supervisor. (Tr. 50-51). The VE characterized each of these roles as skilled positions requiring a medium level of exertion as performed, with a specific vocational preparation of 6 or 7. (Tr. 51).

The ALJ next asked the VE to assume that a hypothetical individual had the same age, education, and work history as the Claimant who was capable of performing work with some physical limitations, including—as relevant to the matter *sub judice*—"a job that only occasionally requires overhead reaching bilateral[ly.]" (Tr. 52). The VE opined that "such an individual would be able to perform the duties of past work as an insurance

sales agent as performed." *Id.* The VE further opined that such an individual would be able to perform certain "light occupational titles" set forth in the Dictionary of Occupational Titles ("DOT"), including three representative occupations: (1) "photocopying machine operator;" (2) "electrical accessories assembler I;" and (3) "cashier II." (Tr. 53-54). The VE further testified that, "identifying work situations that are a light classification, but do allow for . . . reaching overhead," he was "relying on [his] education, training, and experience . . . [i]n those areas not enumerated by the DOT[.]" (Tr. 54). The ALJ then asked the VE to assume that the hypothetical individual was further limited such that she could only occasionally reach with the dominant arm in all directions. (Tr. 58). In response, the VE testified that this additional limitation would eliminate the three representative occupations previously discussed, because "the other light work activities, for the most part, are going to require frequent to continuous [reaching]." (Tr. 58-59). Lastly, in response to questioning from Claimant's counsel, the VE testified that a need for frequent reminders regarding job duties would impact the hypothetical individual's ability to perform work. (Tr. 58).

### iv. Consultative Examination

Stephen Nutter, M.D., performed an internal-medicine examination of the Claimant on October 5, 2023. (Tr. 1068). Claimant reported to Dr. Nutter that, *inter alia*, she experienced "numbness and tingling in her left arm," her back pain was aggravated by lifting, and "reaching overhead hurts her neck." *Id.* Claimant also reported that she has joint pain in, *inter alia*, her hands and shoulders, and that "reaching, lifting, pushing pulling and using the arms overhead will increase the shoulder pain." (Tr. 1069). Claimant also reported that "she was diagnosed with fibromyalgia." *Id.* Dr. Nutter noted that

medical imaging showed "degenerative disc disease and a . . . disc protrusion" at the "C5-6" vertebrae in her spine. (Tr. 1068).

On examination, Dr. Nutter noted in relevant part that "[t]here is pain with range of motion testing in the right shoulder when doing internal rotation," but "[t]here is no pain in the left shoulder . . . [and] no tenderness noted in the shoulders." (Tr. 1070). Further, Claimant's "elbows and wrists are non-tender," with "no redness, warmth, swelling or nodules." *Id.* Dr. Nutter noted "no tender points . . . in the forearms," and a negative "Tinel's test . . . at the elbows and wrists." *Id.* Claimant exhibited tenderness in the right finger joints, but not the left, and Dr. Nutter noted "no redness, warmth, . . . swelling . . . [or] atrophy." *Id.* Claimant had a normal grip strength bilaterally. *Id.* With respect to the cervical spine, examination "reveal[ed] no tenderness over the spinous processes . . . [and] no evidence of paravertebral muscle spasm." *Id.* However, Dr. Nutter found that "[r]ange of motion testing of the cervical spine causes neck pain." *Id.* Dr. Nutter also found that "[m]uscle strength is normal at 5/5 bilaterally in the upper extremities." (Tr. 1071). Based upon these findings, Dr. Nutter's impression was "chronic cervical and dorsolumbar strain with cervical degenerative disc disease" as well as "degenerative arthritis." *Id.*

Dr. Nutter completed a *Medical Source Statement of Ability to Do Work-Related Activities (Physical)* form. (Tr. 1074). Therein, Dr. Nutter indicated, *inter alia*, that Claimant was able to lift objects weighing up to ten pounds frequently, and able to lift and carry objects weighing between eleven and twenty pounds occasionally. *Id.* Further, Dr. Nutter indicated that Claimant was able to reach—both with respect to reaching overhead and reaching in general—"frequently" with respect to her right hand, and "continuously" with respect to her left hand. (Tr. 1075-1076).

### C.    Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R.

16

§§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*,

17

826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national

economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant satisfied the insured status requirements of the Social Security Act through the date of the decision. (Tr. 17). She further determined that Claimant had not engaged in substantial gainful activity since September 18, 2021, the alleged onset of her disability. (Tr. 17). Next, the ALJ found that the following of Claimant's asserted impairments constituted "severe" impairments: degenerative-disc disease; degenerative-joint disease; right-shoulder arthralgia; and history of seizures. (Tr. 18).

Turning to Claimant's mental-health impairments, the ALJ found that Claimant had only mild limitations with respect to each of the four areas of mental functioning—(1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. (Tr. 18). Based upon these findings, the ALJ determined that Claimant's medically-determinable mental impairments of adjustment disorder with depression and anxiety, "does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore nonsevere." (Tr. 18).

Next, based upon these findings, the ALJ found that none of Claimant's impairments, or a combination thereof, met or medically equaled any of the impairments listed in the Social Security Administration's applicable regulations, at 20 C.F.R. Part 404,

Subpart P, Appendix 1. (Tr. 20). Upon assessing Claimant's RFC, the ALJ determined the following:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently; she can sit 6 hours total during an 8-hour workday as well as stand/walk 4 hours total during an 8-hour workday. She can never crouch, kneel, crawl, or climb ladders, ropes, or scaffolds; she can occasionally balance, stoop, and climb ramps and stairs. She can occasionally reach overhead, bilaterally. She can work at a job that allows her to avoid concentrated exposure to extreme cold or humidity; and avoid all exposure to extreme vibration, unprotected heights, or hazards such as dangerous moving machinery.

(Tr. 21). Notably, the ALJ did not include any mental-health limitations in the Claimant's RFC. *See id.*

The ALJ concluded that Claimant is capable of performing her past relevant work as an insurance sales agent—classified as "light exertional work, with a specific vocational preparation (SVP) of 6"—because "[t]his work does not require the performance of work-related activities precluded by the claimant's residual functional capacity." (Tr. 29). The ALJ supported this finding with the VE's testimony. (Tr. 29-30). The ALJ also made an alternative step-five finding, concluding that Claimant could also perform three representative occupations set forth in the Dictionary of Occupational Titles: (1) "photocopy machine operator," (2) "electrical accessory assembler," and (3) "cashier II." (Tr. 30). The ALJ relied upon the VE's testimony for this finding as well. (Tr. 29-30). Based upon the foregoing findings, the ALJ concluded that Claimant was not disabled, and had not been under a disability during the relevant time period. Accordingly, the claim for benefits was denied.

## II.    LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

## III.    DISCUSSION

Claimant sets forth two assertions of error in this § 405(g) action. First, Claimant argues that the ALJ's finding at step four—that Claimant is able to perform her past skilled work—is "fatally flawed" because "the ALJ failed to accommodate [Claimant's] proven mild mental limitations or explain why they were omitted from the . . . RFC assessment." (ECF No. 10 at 1). Second and finally, Claimant argues that there was a conflict in the vocational evidence as to whether [she] could perform the occupations adopted by the

ALJ at step five—which required at least *frequent* reaching—in light of the RFC limitations adopted by the ALJ—which stated Claimant was only capable of *occasional* reaching. *Id.* at 3.

A.    First Assertion of Error

Claimant first asserts that the ALJ erred by failing to include, or explain the absence of, mental RFC limitations corresponding to her non-severe mental impairments. Since the ALJ found at step two that the Claimant's medically-determinable impairments caused "mild" limitations in all four functional areas—(1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing herself—Claimant argues that "it was legal error for the ALJ to omit [Claimant's] proven mental functional limitations from the RFC finding without explanation" at step four. (ECF No. 6 at 4-5). Claimant explains that, in the vast majority of disability cases, "any omission of mild mental functional limitations may likely constitute harmless error" because "the outcome of the application turns on the issue of the claimant's capacity to perform the fairly minimal mental demands of unskilled work." *Id.* at 5. Here, however, Claimant points out that "this case does not turn on the capacity to perform unskilled work, but rather on whether [Claimant] remained capable of performing her past *skilled* work as an insurance sales agent, as found by the ALJ." *Id.* at 9. Under such circumstances, Claimant argues that the ALJ erred when she "made no attempt to explain how [Claimant] could perform this skilled occupation with her found [mild] mental limitations." *Id.* Claimant argues that—while the ALJ considered all of the *physical* impairments at issue—the ALJ "provided no such analysis of [Claimant's] mental impairments on her ability to perform work-related activities." *Id.* at 10. Claimant insists that the ALJ's decision is thus "facially defective" in light of "the

absence of any specific explanation *in the RFC analysis* as to why the mental limitations identified [at step two]" did not result in mental limitations in the ALJ's ultimate RFC determination. *Id.* at 11. Claimant concludes that, "[o]n remand, the ALJ must determine what impact [Claimant's] proven mental functional limitations have on her capacity to perform [her] skilled higher reasoning level prior work"—or, alternatively, "[i]f the ALJ includes no mental functional limitations in [her] RFC finding . . . then the ALJ must affirmatively explain her reasons for doing so." *Id.* at 12.

Put simply, mental limitations identified using the psychiatric review technique—particularly mild limitations—do not necessarily indicate work-related functional limitations that must be present in the RFC assessment. *Mascio*, 780 F.3d at 638 (explaining that a claimant's "moderate limitation in concentration, persistence, or pace at step three" may not "affect [her] ability to work" and thus "does not translate into a limitation in [her] RFC]"). This is true even if a job requires certain skills, as Claimant argues. *See Wall v. Saul*, 2:20-cv-460, 2021 WL 5225792, at *8 (S.D. W. Va. June 2, 2201), *adopted*, 2021 WL 5230989 (S.D. W. Va. Nov. 9, 2021). Rather, a claimant's RFC represents "the most she can still do despite her limitations" in any work environment, regardless of the particular skills required. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). "[A]lthough some consideration [of the effects of the claimant's non-severe impairments] is required [in the RFC assessment], there is no requirement that the RFC reflect a claimant's non-severe impairments to the extent the ALJ reasonably determines such impairments do not actually create functional limitations on a claimant's ability to work." *Perry v. Colvin*, No. 2:15-cv-01145, 2016 WL 1183155, at *5 (S.D.W. Va. Mar. 28, 2016) (citing 20 C.F.R. § 404.1545(a)(1); *Presnell v. Colvin*, No. 1:12-cv-299-FDW, 2013 WL 4079214, at *4 (W.D.N.C. Aug. 13, 2013)).

In this case, the ALJ explained her consideration of Claimant's non-severe mental impairments and expressly found that mental RFC limitations were unwarranted, stating that there was no more than "minimal limitation in Claimant's ability to perform basic work activities." (Tr. 20). Further, the ALJ specifically explained that Claimant's RFC reflected "the degree of limitation [she] . . . found in the 'paragraph B' mental function analysis" at step two. *Id.* As such, the ALJ plainly found that further limitations were not warranted in the RFC. Moreover, the ALJ explained the basis in the record for this determination. The ALJ explained that Claimant had no significant history of specialized mental-health treatment; rather, Claimant's treatment for her mental-health impairments consisted solely of a medication adjustment and a few appointments with a psychologist that she subsequently failed to pursue. (Tr. 18). Further, the ALJ pointed to the hearing testimony of Dr. Cohen—a board-certified psychiatrist—in support of her determination, as well as Claimant's largely functional activities of daily living. (Tr. 19).

The ALJ's findings—which, notably, are unchallenged by Claimant—are supported by the record. As the ALJ pointed out, the record indicates that Claimant was able to carry out many activities of daily living such as pet care, meal preparation, household chores, and socializing. (Tr. 299-303). Furthermore, as Dr. Cohen testified, there is very little medical evidence in the record concerning Claimant's mental impairments. In November 2022, she reported some feelings of depression to her primary-care physician and was diagnosed with depressive disorder. (Tr. 991-992). Her provider changed her medication "in hopes of better control of depression." (Tr. 992). Claimant was seen by a psychologist in April 2023, reporting that she was having difficulty adjusting to being at home instead of working. (Tr. 976-977). She followed up with the psychologist approximately two weeks later, where her progress was noted to be "good." (Tr. 978). However, Claimant canceled

her next appointment and there is no other evidence of mental-health treatment in the record. During physical examinations with other providers, Claimant's mental-status was consistently observed to be "grossly normal" or otherwise unremarkable on examination. (Tr. 527, 535, 540, 545, 578, 586, 606, 644, 649). Dr. Cohen testified that Claimant's adjustment disorder with some depression and anxiety improved with medication. (Tr. 70-71). Dr. Cohen further testified that the record was "very thin," particularly with respect to Claimant's depression in light of conflicting records indicating that she had a normal mood. (Tr. 71). Dr. Cohen concluded that "I don't have any work-related limitations for her emotionally." (Tr. 72). The ALJ explained that she found Dr. Cohen's opinion persuasive, and relied on his testimony in reaching her determination, because Dr. Cohen "supported his opinion with analysis of the record, which is consistent with no significant history of specialized mental health treatment." (Tr. 18). The ALJ concluded that "[C]laimant's medically determinable mental impairment of adjustment disorder with depression does not cause more than minimal limitation in [her] ability to perform basic mental work activities and is therefore nonsevere." *Id.*

The undersigned **FINDS** that the ALJ's determination is supported by the record, and that the ALJ's explanation creates an accurate and logical bridge between the evidence and her findings. The ALJ's discussion at step two that Claimant's mental-health limitations had a minimal impact on vocation and were being managed is sufficient to inform the Court what impact these limitations had in the RFC analysis. *See Britt v. Saul*, 860 Fed. App'x 256, 262 (4th Cir. 2021) ("While the administrative law judge did not specifically address [the claimant's non-severe impairments] in the residual-functional-capacity analysis, neither our caselaw nor the regulations explicitly require this."). In summary, the ALJ sufficiently explained her findings regarding Claimant's mental

impairments, and substantial evidence supports her conclusion that they did not cause work-related functional limitations. *See Linda S. v. Dudek*, 2:24-cv-00050, 2025 WL 942843, at *6 (S.D.W. Va. Mar. 28, 2025); *Pamela H. v. O'Malley*, 2:23-cv-00376, 2024 WL 1270527, at *11 (S.D. W. Va. Mar. 4, 2024), *adopted*, 2:23-cv-00376, 2024 WL 1260613 (S.D.W. Va. Mar. 25, 2024); *Denise R. v. Bisignano*, 2:25-cv-00083, 2025 WL 2808937, at *6 (S.D.W. Va. June 12, 2025), *adopted*, 2:25-cv-00083, 2025 WL 2808933 (S.D.W. Va. Oct. 2, 2025); *Sandra K. v. Dudek*, 3:24-cv-606, 2025 WL 1129015, at *7 (S.D. W. Va. Mar. 28, 2025, *adopted*, 2025 WL 1126548 (S.D. W. Va. Apr. 16, 2025). Under the circumstances, therefore, Claimant's assertion of error fails.

      B.    <u>Second Assertion of Error</u>

Finally, Claimant asserts that the ALJ erred because she "failed to resolve the conflict regarding [Claimant's] ability to perform overhead reaching." (ECF No. 6 at 13-16). The ALJ's RFC determination expressly states that Claimant can reach overhead bilaterally only "occasionally." (Tr. 21). However, in addition to finding that Claimant was able to perform her past relevant work as an insurance sales agent, the ALJ alternatively found that Claimant could perform three representative occupations set forth in the Dictionary of Occupational Titles: (1) "photocopy machine operator," (2) "electrical accessory assembler," and (3) "cashier II." (Tr. 30). According to Claimant, each of these three representative occupations requires "frequent" reaching overhead. (ECF No. 6 at 14). Claimant argues that "[a]n individual who is limited to occasional reaching cannot perform occupations requiring frequent reaching." *Id*. As such, "there was an apparent conflict in . . . the RFC and hypothetical question to the vocational expert[.]" *Id*. Claimant asserts that, when an apparent conflict exists between the oral testimony of the vocational expert and the Dictionary of Occupational Titles, the ALJ must obtain a reasonable

explanation from the VE as to why their testimony appears to conflict, and then the ALJ must identify, address, and explain his or her resolution of that conflict. *Id.* (citing SSR 00-4p, 2000 WL 1898704, at *1-4).

Even assuming, *arguendo*, that the ALJ erred in finding Claimant's RFC permitted her to perform the three representative occupations at issue, any error was harmless. Courts engage in harmless error review of agency denials of social security benefits. *See, e.g.*, *Morgan v. Barnhart*, 142 Fed. App'x 716, 723-25 (4th Cir. 2005). Pursuant to this standard, the Court "may not reverse an ALJ's decision on account of an error that is harmless." *Lisa P. v. Comm'r of Soc. Sec.*, 3:23-cv-5357, 2024 WL 619737, at *5 (W.D. Wash. Feb. 14, 2024). Generally, an error is harmless if it is inconsequential to the ultimate nondisability determination. *Id. See also Emigh v. Comm'r of Soc. Sec.*, 2015 WL 545833, at *21 (N.D. W. Va. Feb. 10, 2015) ("The court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate non-disability determination."). "The burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Lisa P.*, 2024 WL 619737, at *5 (citing *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)).

Here, Claimant did not satisfy her burden to demonstrate that such alleged error was harmful, because the ALJ's step-five finding with respect to the three representative occupations was merely an alternative finding. The ALJ independently found that Claimant was capable of performing her past relevant work, and Claimant does not assert that her past relevant work required frequent overhead reaching such that the VE's testimony would conflict with the Dictionary of Occupational Titles. The step-five finding is inconsequential to this alternative determination. *See Barge v. Berryhill*, 1:16-cv-290,

2017 WL 3669556, at *5 n.7 (M.D.N.C. Aug. 24, 2017) ("[T]he ALJ did make an alternative finding at step five that Plaintiff could perform other jobs that exist in significant numbers in the national economy, but this alternative finding would apply only if Plaintiff could not return to his past relevant work."). *See also Hilton v. Berryhill*, 7:17-cv-123, 2018 WL 3420826, at *6 n.10 (W.D. Va. July 13, 2018) (finding that "remand would not be necessary if substantial evidence supports the ALJ's alternative finding that Hilton was not disabled at step four, as remand would not result in a different result"); *Shellitte Eve K. v. Comm'r, Soc. Sec. Admin.*, 20-cv-0322, 2021 WL 978825, at *6 (D. Md. Mar. 16, 2021).

In response to the Commissioner's argument that the ALJ's alternative argument renders the step-five findings "moot," (*see* ECF No. 9 at 18), Claimant merely states in relevant part that remand is required because "the ALJ's step four finding is legally flawed[.]" (ECF No. 10 at 3). As set forth *supra*, however, the undersigned found that the ALJ's step-four finding was supported by substantial evidence and did not constitute reversable error. As Claimant has not met her burden to demonstrate harmful error, therefore—and indeed, has not even addressed the issue—remand is not proper under the circumstances.

## IV.    RECOMMENDATION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 6), **GRANT** the Commissioner's request to affirm his decision (ECF No. 9), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Berger.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTERED:   November 17, 2025

Dwane L. Tinsley
United States Magistrate Judge